# AFFIDAVIT OF SPECIAL AGENT CHRISTIAN BRACKETT

I, Christian Brackett, being duly sworn, depose and state as follows:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice, and have been so employed since 1997. I am currently assigned to the Boston Office of the New England Field Division, and my primary duties include the investigation of organized narcotics traffickers. Since joining DEA, I have participated in hundreds of narcotics investigations, both as a case agent and in a subsidiary role. Those investigations have resulted in the arrest and prosecution of hundreds of individuals and the seizure of large quantities of cocaine, heroin, ecstasy, Oxycontin, oxycodone, marijuana, and methamphetamine.

2. I have debriefed hundreds of defendants, informants, and witnesses with personal knowledge regarding narcotics trafficking activities and the operation of narcotics trafficking organizations. I have participated personally in numerous aspects of narcotics trafficking investigations, including executing search and arrest warrants, conducting surveillance, using confidential informants, acting in an undercover capacity, supervising controlled purchases of narcotics and conducting court-authorized interceptions of wire and electronic communications. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of

narcotics, as well as the collection of illicit proceeds from drug trafficking activities. Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, human carriers, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and narcotics proceeds. Through my education, training and experience, I have become familiar with the methods of operation used by drug traffickers, including those relating to trafficking, storing, and transporting narcotics; the collection of proceeds of trafficking activities; use of tools of the drug trade; and arranging and executing drug transactions, including the prices for drugs and how such transactions are negotiated, among other things.

2. This affidavit is submitted in support of a criminal complaint charging Joseph F. Deignan, III, of Framingham, MA ("DEIGNAN") with obtaining controlled substances by fraud or forgery in violation of Title 21, United States Code, Section 843(a)(3) and using without lawful authority a means of identification of another person in violation of 18 U.S.C. 1028 (a)(7).

3. This affidavit is based upon information I have gained from my participation in this investigation along with my training and experience and information I have received from other law enforcement officers and Diversion Investigators. Because this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to

2

me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to charge DEIGNAN with the offenses of obtaining oxycodone with acetaminophen, a Schedule II controlled substance; hydrocodone, a Schedule III controlled substance; and alprazolam and diazepam, a Schedule IV controlled substance in violation of Title 21, United States Code, Section 843(a)(3); and using without lawful authority a means of identification of another person in violation of 18 U.S.C. 1028 (a)(7).

## PROBABLE CAUSE

4. On November 13, 2012, DEA Diversion Investigator Eunice E. Muñiz (herein after referred to as "DI Muñiz") received information from a pharmacist employed at Walgreeen's Pharmacy, 653 Worcester Road, Framingham, MA 01701 that an individual who identified himself as G.C. using a Massachusetts driver's license was filling fraudulent prescriptions for hydrocodone bitartrate and acetaminophen 5-325 mg and alprazolam 0.5 mg.[1] I now know this individual to be DEIGNAN based on evidence described in detail below.

---

[1] Hydrocodone is the most frequently prescribed opioid in the United States and is associated with more drug abuse and diversion than any other licit or illicit opioid. It is an orally active agent most frequently prescribed for the treatment of moderate to moderately severe pain. Its analgesic potency is similar to morphine. The drug Alprazolam belongs to a group of drugs called benzodiazepines and is used to treat anxiety disorders.

[2] The Massachusetts Prescription Monitoring Program was established by Joint Regulation of the Drug Control Program and Board of Registration in Pharmacy. It collects data on Schedule II to V prescriptions dispensed by community, clinic and outpatient pharmacies. This online database provides a maximum one-year prescription history.

5. The pharmacist stated that she learned through the Massachusetts Prescription Monitoring Program (PMP)[2] that the prescriptions were being paid for in cash and that G.C.'s driver's license was used to fill several prescriptions under the name of S.C.-S. at a CVS Pharmacy located in Marlboro, MA. As a result of the PMP checks, the pharmacist contacted the physicians whose names appeared on the prescriptions (Dr. K. and Dr. S.) and both physicians denied having seen G.C. or S.C.-S., thereby confirming the prescriptions were fraudulent.

6. Based upon the information received, DI Muñiz conducted a query in the Massachusetts Prescription Monitoring Program online database to confirm the information that was received and to obtain the prescription history of G.C. and S.C.-S. for the time period of November 1, 2011 through November 12, 2012. According to the results obtained, there were 26 prescriptions filled using the name of S.C.-S. and 44 prescriptions filled using the name of G.C. The prescriptions for G.C. were filled utilizing the DEA registration numbers of Dr. K. and Dr. C. The prescriptions for S.C.-S. were filled utilizing the DEA registration number of Dr. M., and Dr. S.. DI Muñiz then conducted a follow up request to the PMP for prescription history dating back to January 1, 2009 for G.C. This request revealed that G.C.'s Massachusetts Driver's was also used to fill prescriptions under the name of R.C. filled under the DEA registration number of Dr. M. and Dr. S.

Results further indicated that the prescriptions were filled at three different CVS pharmacies.

7. On November 19, 2012, DI Muñiz conducted a license and background check of G.C. and learned that G.C. lives in Norwood, MA. A driver's license, criminal and commercial database check was conducted for S.C.-S. and R.C.; however, no persons with their identity could be found - indicating that the names were possibly false.

8. On November 27, 2012, DI Muñiz and DI George Haley went to CVS Pharmacy in Marlborough, MA to obtain original prescriptions tendered by G.C. and investigate the matter further. Investigators told the pharmacist to be aware of any prescriptions presented at the pharmacy under the name of G.C. and S.C.-S. because they were likely fraudulent.

## ARREST OF DEIGNAN ON DECEMBER 7, 2012 WITH G.C.'S DRIVER'S LICENSE

9. On December 7, 2012, Officer Borden Wicks of the Marlboro Police Department was alerted by a pharmacist from CVS Pharmacy in Marlborough, MA that an individual who identified himself as G.C. had presented a fraudulent prescription. Officer Wicks arrived at the pharmacy and when the individual returned to the pharmacy to pick up his prescription, he was approached by Marlborough Police and arrested for uttering a false prescription, forgery of a

5

document and obtaining a drug by fraud. The individual was identified as DEIGNAN by a driver's license and by his own admission. On the front seat of DEIGNAN's vehicle was a Massachusetts driver's license in the name of G.C.

10. DEIGNAN was advised of his rights and he stated he understood his rights. DEIGNAN told Officer Wicks that he is addicted to pain medication and has been for some time. Officer Wicks asked DEIGNAN where he got G.C.'s license and DEIGNAN stated he found it. DEIGNAN informed Officer Wicks that he was a newly retired police officer out of Watertown Police Department. Since then, I have learned that DEIGNAN was a former Sergeant of the traffic division at the Watertown Police Department and retired in February 2012.

## **VERIFICATION OF FALSE PRESCRIPTIONS**

11. On December 5, 2012, DI Muñiz and DI Jill Hardie traveled to 521 Mt. Auburn Street, Watertown, MA 02472 to interview Dr. S.'s staff regarding the prescriptions that were filled utilizing her DEA registration number. That office confirmed that G.C. and S.C.-S. were not patients of Dr. S. and that the signatures on the prescriptions described herein were false.

12. On December 5, 2012, Investigators also interviewed Dr. K. and learned that G.C. and S.C.-S. were not his patients and he never wrote any prescriptions for them. Dr. K. also confirmed the paper used to write the prescriptions did not match the paper he uses. In addition, Dr. K. stated the

6

signature on the prescriptions was not his, confirming the prescriptions were fraudulent.

13. On January 25, 2012, DI Muñiz contacted Dr. C. and he confirmed that he did not have a patient under the name of G.C. Dr. C. confirmed that DEIGNAN was not his patient.

14. On December 20, 2012, DI Muñiz and Special Agent Kristine Tierney met with Dr. M. to verify prescriptions that were written for Joseph DEIGNAN and S.C.-S.. DI Muñiz learned that Joseph DEIGNAN had been treated by Dr. M., but that S.C.-S. was not a patient. D/I Muñiz showed the prescriptions that were filled under the name of S.C.-S. and Dr. M. stated he does not use the type of paper used for the prescriptions and stated that the signature on the prescriptions was not his, confirming the prescriptions were fraudulent.

15. This investigation has revealed that, since May 2010, there have been at least 100 false prescriptions, including refills, filled in the manner described in this affidavit.

## INTERVIEWS OF WATERTOWN POLICE OFFICERS

16. A review of the real G.C.'s Massachusetts Criminal History Board of Probation (BOP) shows that he had been arraigned in Waltham District Court on July 15, 2010 on an incident involving a citation by the Watertown Police

Department. The court documents indicate that on March 12, 2010, the real G.C. was stopped by a member of the Watertown Police Department for speeding. That traffic officer conducted a license check which revealed that G.C.'s license was revoked. That traffic officer issued G.C. a Criminal Application/Citation M9147049 for speeding and operating after a suspended/revoked subsequence offense.

17. On January 3, 2012, I interviewed the officer who stopped G.C. for speeding on March 12, 2010. Although he did not remember stopping G.C., he explained that the department's procedure when someone is stopped and the license is suspended is to seize the driver's license and attach it with a paper clip to the report. The report is then forwarded to the supervisor. That officer further stated that if G.C. had his license in his possession that day, he would have taken it and attached it to his report, which would have been forwarded to DEIGNAN, who was his supervisor at the time. This procedure was confirmed by interviews of several other members of the Watertown Police Department.

18. On January 24, 2013, I interviewed a Watertown Police Captain, who had conversations with DEIGNAN since the latter's arrest. Among other things, DEIGNAN told him that he had a problem with pills and that he used the name of Dr. K and another female doctor to falsify prescriptions. DEIGNAN stated to this officer that he had taken the license from the Watertown Police Department while

8

still employed there. DEIGNAN further told him that he only used the one identification, which was the subject of his recent arrest.

## INTERVIEW OF G.C.

19. On January 25, 2013, SA Brackett and DI Muñiz interviewed G.C. G.C. stated he remembered being stopped in Watertown, MA a few years ago and cited for driving with a suspended license. G.C. stated that his license had been suspended because he did not pay a fine. G.C. stated that after being stopped, he gave the police officer his driver's license and the officer walked back to his cruiser and ran some checks. The officer then walked back to G.C.'s vehicle and told G.C. that his license was suspended and he had 20 minutes to get someone down with a license or the car would be towed. G.C. stated he received a ticket and, while he does not specifically remember, believes the officer must have kept his driver's license, because after later paying the fines, G.C. had to go to the registry and obtain another driver's license.

20. G.C. was shown copies of the prescriptions described in this affidavit issued in his name and in the names of S.C.-S. and R.C. He confirmed that he did not fill or pick up any of the prescriptions. G.C. further stated that he had never seen any of the doctors listed on the prescriptions.

21. WHEREFORE, based upon my experience in this investigation, I have probable cause to believe, and do so believe, that DEIGNAN has committed violations of federal law, including obtaining controlled substances by fraud or forgery in violation of Title 21, United States Code, Section 843(a)(3) and using without lawful authority a means of identification of another person in violation of 18 U.S.C. 1028 (a)(7).

Christian Brackett
Special Agent
Drug Enforcement Administration

Sworn and subscribed to before me this 4th day of March, 2013.

Honorable Leo T. Sorokin
Chief United States Magistrate Judge
District of Massachusetts